UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                  :
LAWRENCE BRENNER,              :
                  :
             Plaintiff,     :  **MEMORANDUM**
                  :  **DECISION & ORDER**
       - against -     :
                  :  14 Civ. 3559 (BMC)
CITY of NEW YORK DEPARTMENT of  :
EDUCATION, et al.,          :
                  :
          Defendants.  :
-------------------------------------------------------- X

**COGAN,** District Judge.

Plaintiff brought this action under Title VII, the ADEA, and 42 U.S.C. § 1983 alleging discriminatory termination on the basis of age, religion, and race, as well as a hostile work environment.  Before me is defendants' motion for summary judgment.  For the reasons that follow, defendants' motion is granted.

## BACKGROUND

The following facts are viewed in the light most favorable to plaintiff and are undisputed. Plaintiff was, until his termination, a tenured teacher employed by the Board of Education of the City School District of the City of New York, sued herein as the Department of Education ("BOE").  At the time of his termination in 2012, at the recommendation of a neutral arbitrator following 10 days of hearings, plaintiff had accumulated a history of unsatisfactory performance reviews dating at least to 2009.  The arbitrator found, in essence, that plaintiff's cordial demeanor and rapport with his students was not enough to excuse his lack of effort (or ability) to master the technical aspects of his profession as a special education teacher or to incorporate the recommendations of those who sought to help him improve.  As the arbitrator stated, plaintiff's

1

case required him to "bifurcate the personality and likability of the Respondent and his body of work as a New York City teacher." The arbitrator summed up defendants' voluminous documentation of plaintiff's unsatisfactory performance in the classroom and defendants' own remedial efforts by saying:

> [I]n all my years connected to education on multiple levels I have never seen the plethora, cornucopia and extent of resources dedicated to one individual in an effort to resuscitate their teaching approach and pedagogy. It is indeed unfortunate that there was not the Return on Investment (ROI) that I am confident many people were hoping would be the outcome for this respondent.

Plaintiff began teaching in 1999 and began working at P.S. 15 in Queens in the year 2000. During his first five years at P.S. 15, plaintiff received satisfactory evaluations in all years except the 2002-03 school year. At the end of that school year, then-Principal Andrew Newman gave plaintiff an unsatisfactory year-end rating, but told plaintiff that if he had "grieve[d]" the rating, he "would have overturned it."

Starting in 2005-06, plaintiff became an individual education plan ("IEP") teacher, meaning that his job was to assist classroom teachers with their "at risk" students. Plaintiff remained in that position in 2006-07, the year that defendant Antonio K'Tori ("K'Tori") took over as Principal of P.S. 15. That year, K'Tori gave plaintiff a satisfactory year-end rating but describes his initial impression of plaintiff as someone "struggling with organization, management, planning and focus." The following year (2007-08), plaintiff's application to renew his IEP position was denied, and he took an "integrated co-teaching" ("ICT") position, in which he would work alongside a general education teacher in a fourth grade classroom. K'Tori conducted a formal observation of plaintiff's classroom in March 2008, noting shortcomings in (among other things) classroom organization, lesson preparation and "differentiation" among students with different learning needs. K'Tori did not rate plaintiff's performance for the 2007-08 school year as either satisfactory or unsatisfactory.

During the 2008-09 school year, at K'Tori's suggestion, plaintiff began to participate in the Peer Intervention Program ("PIP"), a mentorship program internal to the school. K'tori issued plaintiff at least two unsatisfactory formal observation reports during that year, and an unsatisfactory year-end rating.

For the 2009-10 school year, plaintiff was assigned to an ICT kindergarten classroom. He was given a full-time co-teacher, but she suffered an injury and was replaced by a series of substitutes over the course of the year. Plaintiff never wrote a formal complaint about the impact of this lack of continuity, but mentioned it to K'Tori, who (as plaintiff recalls) did not give him a "definitive answer." K'Tori issued plaintiff three more unsatisfactory formal observation reports and, at the end of that year, issued plaintiff an unsatisfactory year-end rating. That review specifically warned plaintiff that due to his poor classroom performance and lesson preparation he "must significantly improve [his] skills for the 2010-11 year in order to continue employment with the BOE."

In 2010-11, plaintiff was a second grade ICT teacher. He received three unsatisfactory formal observation reports from Assistant Principal Earl Braithwaite. Braithwaite commended plaintiff for his rapport with students, but noted shortcomings in plaintiff's pedagogy such as (once again) a lack of differentiation and that "[t]he timing and pacing of the lesson and activities were unacceptable." K'Tori issued plaintiff an unsatisfactory year-end rating.

In the Fall of 2011, plaintiff participated in the "PIP+" mentorship program, which involved 10 sessions (including six classroom observations) with an independent consultant, Suzanne Rockman. At the conclusion of the program, Rockman informed K'Tori by letter that plaintiff "showed no progress in the area of differentiated instruction" which she found "particularly egregious in a class with special educations students." She opined that "[t]he

individual learning needs of these students were not addressed" by plaintiff's teaching. She also noted that plaintiff did not "plan for or provide opportunities for interaction among students" and that his lessons "did not have a developmental sequence of activities aligned with an objective." She concluded that "[e]ffective teaching and learning was not observed" and that plaintiff was "unsatisfactory in his instructional job performance."

In addition, parents of plaintiff's students wrote to K'Tori to complain about plaintiff's failure to control his classroom. (Plaintiff asserts that he asked his students to have their parents write the letters in order to shed light on a perceived lack of support from K'Tori.)

At the end of the 2011-12 school year, K'Tori informed plaintiff that pursuant to N.Y. Ed. Law § 3020-a, the BOE charged plaintiff with fifteen specifications of "unprofessional conduct while a teacher . . . during the 2009-10, 2010-11, 2011-12 school years." After ten days of hearings in front of a neutral arbitrator, the arbitrator found that plaintiff had failed to, among other things, "properly, adequately, and effectively" plan and/or execute lessons, perform and/or maintain records of student assessments, follow curriculum, maintain his classroom environment, and assume the role of lead teacher; and that plaintiff had failed to accept and/or heed advice, counsel, instruction, remedial professional development and/or recommendations. The arbitrator found plaintiff "guilty of all the Specifications referenced" in the charges, and that the appropriate penalty was termination.

On September 5, 2013, plaintiff filed a verified complaint with the New York State Division of Human Rights ("SDHR") charging the BOE with an unlawful discriminatory practice relating to employment. In a Determination and Order After Investigation, the SDHR found "No Probable Cause" to believe that the BOE had engaged in an unlawful discriminatory practice. The SDHR Determination stated that:

The record . . . does not support that K'Tori . . . moved to end [plaintiff's] employment because of any of his protected classes, but rather that his position was ended due to his poor performance, as observed by persons who were members of K'Tori's administration and staff, and those who were not, including Rockman and students' parents, whose letters of concern appear in the file.

Plaintiff's proffer of evidence in opposition to summary judgment consists of his own deposition testimony and affidavit, along with the affidavits of several of his former co-workers. Much of this evidence comes in the form of remarks made by K'Tori to plaintiff and his co-workers. Plaintiff overheard K'Tori comment that another teacher "should retire because she's been working too long and she's too old and can't make it up the stairs." According to one of plaintiff's former co-workers, when she approached K'Tori to request that the school display a Menorah during the holidays, K'Tori "did not offer for the school to buy a menorah" despite the fact that Christmas decorations "were being displayed." (K'Tori did, apparently, allow the co-worker to purchase and set up a Menorah at her own expense.) When plaintiff took time off to attend his brother's funeral on short notice, explaining that to do so was required by Jewish custom, K'Tori said something to the effect of "I didn't think you were that Jewish" or "I didn't think you were that religious." In response to a co-worker's request to leave early to observe Rosh Hashanah, K'Tori questioned "why Jewish people need all this time away for holidays."

Plaintiff testified at his deposition that "[K'Tori] has mentioned on a number of occasions to me and to other people that I'm ruining his little black children." During a conversation in 2009 that plaintiff recorded (and the recording of which is before me), K'Tori admonished him for failing to provide a lesson plan to his co-teacher, and at one point, told plaintiff: "You are hurting little black kids." (The composition of plaintiff's class at the time of this conversation was almost entirely black.) One of plaintiff's co-workers avers that "[o]n at least one occasion, K'Tori stated to me that he would not let any teachers hurt his little 'black children.'" Another

avers that "[o]n one occasion, in the cafeteria, while at a faculty conference, K'Tori stated 'you white teachers are hurting my little black children.'"

Plaintiff also points to various ways in which K'Tori treated younger teachers preferentially. For example: Plaintiff testified that K'Tori would direct him to stand when teaching small groups, but that he had observed K'Tori permitting younger teachers to sit under the same circumstances – although he concedes that he never observed this happening while K'Tori was present. K'Tori took over three months to remove a student with behavioral problems from plaintiff's class, but when the student was returned to a younger colleague's class and his problems resurfaced, K'Tori removed him after a week and a half.[1] K'Tori criticized plaintiff for the condition of his classroom library; one week later, he praised plaintiff's younger co-worker for the same library, thinking she had taken over the job of maintaining it, despite the fact that no changes had been made to it.

Finally, the only two teachers against whom K'Tori brought § 3020-a charges during his time as Principal of P.S. 15 (other than plaintiff) were over 40 – although he admits that a teacher in her mid-twenties was given an unsatisfactory rating and then terminated in 2009-10. (She apparently was not tenured, and so presumably was terminated without § 3020-a charges.)

Plaintiff also proffers evidence purporting to show that his poor performance reviews were fabricated by K'Tori or other supervisors who were influenced by him – *i.e.*, that plaintiff's performance actually was satisfactory – or that K'Tori and those supervisors set him up to fail.

---

[1] Plaintiff's deposition testimony about this incident was offered in response to a question about favoritism toward female teachers, but the co-worker in question was apparently also younger than plaintiff. Quite a bit of plaintiff's proffered evidence of age discrimination appears initially to have been intended to show – or equally suggests – discrimination on the basis of gender, which is not alleged in this case. For example, plaintiff testified at his deposition that one teacher in her mid-twenties received preferential class assignments, but then conceded that "[i]t might not be because she was younger. It might be because she was female."

As to plaintiff's actual performance, plaintiff's co-workers have opined in their affidavits that he is a "skill[ed]" or "great" or "caring" teacher or that "his children were always engaged and controlled." Plaintiff testified that on the three occasions when Assistant Principal Braithwaite observed his class, Braithwaite "gave [him] the impression" that he was satisfied with plaintiff's performance, and opines that Braithwaite was influenced to give him unsatisfactory ratings by K'Tori. Another of plaintiff's co-workers avers that on one occasion, when "the children were acting up" and plaintiff "came to pick the children up [at the gymnasium] to bring the students back to the classroom," another teacher who functions as a dean came to her "[e]ssentially . . . looking for [her] to sign something alleging that [plaintiff] was responsible for the childrens' [sic] behavior and was not able to properly control his students."

As to K'Tori setting him up to fail, plaintiff points out that during K'Tori's time as Principal, plaintiff was assigned to teach grade levels with which he had no experience. In plaintiff's assessment, K'Tori would place "problem children" into his class and refuse to transfer out students who, in plaintiff's view, needed an individualized class setting; he rotated plaintiff's co-teachers too frequently; and another deputy on one occasion undermined plaintiff's authority over his students by refusing to make them sit out a gym class, as plaintiff had requested. Similarly, an interim assistant principal who was observing plaintiff's class told a classroom aide that K'Tori wanted the aide to leave the classroom, where she had been helping a student with behavioral issues. As a result, the student's behavior problems were reflected negatively in plaintiff's observation report. (Plaintiff testified that when he and his co-teacher confronted K'Tori about the incident, K'Tori claimed that he had not been involved.)

One of plaintiff's co-workers avers that she "witnessed, on numerous occasions, K'Tori standing outside [plaintiff]'s classroom effectively spying on him to try to catch [plaintiff] doing something that would warrant discipline."

When K'Tori notified plaintiff of the § 3020-a charges against him, K'Tori directed him not to talk or to be around other teachers at the school. Plaintiff was assigned to work in what he calls a "closet" (a room six by ten or twelve feet, previously used as a book closet), until he was relocated to the library in September 2012. Plaintiff was told to clean the library and organize books that were lying around. At the end of September, plaintiff was relocated back to the "closet" until December 2012.

## DISCUSSION

Summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The record must be construed in the light most favorable to plaintiff, Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102 (2d Cir. 2013), but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505 (1986). In a discrimination case, summary judgment is appropriate "when the moving party demonstrates . . . after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no reasonable jury could find in the non-movant's favor." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996). Because intent is at issue, District Courts must be "especially chary in handing out summary judgment in discrimination cases." Id. at 87. Nevertheless, "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007).

## I.    Disparate Treatment

Discrimination claims under Title VII and the ADEA are governed by the familiar three-step burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  At step one, plaintiff must make out a *prima facie* case by showing that (1) he belongs to a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2d Cir. 2010).  The burden of making this showing is *de minimis*.  See Joseph v. Leavitt, 465 F.3d 87 (2d Cir. 2006).  Circumstances contributing to an inference of discrimination may include, among other things, invidious comments about people in the protected class, or more favorable treatment of employees outside of the protected class.  See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

At step two, a defendant must "articulate some legitimate, nondiscriminatory reason for [his] action," but "need not persuade the court that it was actually motivated by the proffered reason."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks omitted).  Having done so, the presumption of discrimination is rebutted and it "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510–11, 113 S. Ct. 2742 (1993).  If the defendant make this showing, the analysis proceeds to step three.

At step three, the burden then shifts back to the plaintiff to show, "without the benefit of the presumption, that a reasonable jury could conclude that the employer's determination was in fact the result of discrimination."  Ghent v. Moore, 324 F. App'x 55, 56 (2d Cir. 2009) (citing Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008)).  The evidence that should be considered at step three includes "the strength of the plaintiff's prima facie case" as well as "the

probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50, 120 S. Ct. 2097 (2000)) (internal quotation marks omitted) (edit marks in original). At summary judgment, assessment of a plaintiff's *prima facie* case and of his evidence of pretext "tend to collapse as a practical matter under the McDonnell Douglas framework." Collins v. New York City Transit Auth., 305 F.3d 113, 118 n.1 (2d Cir. 2002).

The required showing of causation differs as between plaintiff's age discrimination claims on one hand, and his race and religion claims on the other. To show that a reasonable jury could find that discriminatory intent caused an adverse employment action under Title VII, a plaintiff need only prove that the protected characteristic was at least one of the motivating factors that lead to the adverse action. See Cronin v. Aetna, 46 F.3d 196 (2d Cir. 1995). In contrast, under the ADEA, a plaintiff faces a heightened burden of showing that age was not just a motivating factor, but was the "but for" cause of an adverse action, in order to prevail. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 178, 129 S. Ct. 2343 (2009).

## A. Step One

Plaintiff's burden at step one is minimal, and can be satisfied by any direct evidence that K'Tori made remarks evincing discriminatory animus or treated teachers outside of plaintiff's protected classes more favorably. See Chambers, 43 F.3d at 37; Lewis v. Blackman Plumbing Supply L.L.C., 51 F. Supp. 3d 289, 302 (S.D.N.Y. 2014) (citing, *inter alia*, Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107 (2d Cir. 2004)).

Plaintiff has adduced at least some evidence that K'Tori treated younger teachers preferentially, such as by praising them for the same work for which he had criticized plaintiff,

or by moving more quickly to give them support as to problematic students. He also has adduced evidence of remarks that K'Tori made about older teachers and about white teachers which reflect his views about their performance. Such evidence provides sufficient basis to conclude that plaintiff has met the minimal burden of making out a *prima facie* case of discrimination, at least with respect to his age and race claims.

### B. Step Two

Having determined that plaintiff has made out a *prima facie* case with respect to one or more of his protected classes, there can be no serious dispute that defendants have met their burden at step two of adducing evidence of legitimate reasons for his termination. During the relevant period, plaintiff received at least nine unsatisfactory classroom observations, including several from administrators other than K'Tori; four unsatisfactory year-end ratings; and an unsatisfactory evaluation by an independent consultant in the last year prior to his termination. These negative performance evaluations are consistent in describing an educator who failed to live up to the expectations of his supervisors and peers in his role as a special education teacher, in particular in the areas of differentiation, lesson planning, and classroom management. The analysis therefore proceeds to step three.

### 3. Step Three

Plaintiff faces an uphill battle in showing that a reasonable jury could infer discriminatory termination on this record. That is, first and foremost, because when termination occurs "only after a decision . . . of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination," then "[t]his fact is highly probative of the absence of discriminatory intent in [the] termination." Collins, 305 F.3d at 119. ADEA and Title VII plaintiffs, to survive motion for summary judgment, must "present strong evidence that

the decision was wrong as a matter of fact . . . or that the impartiality of the proceeding was somehow compromised." Collins, 305 F.3d at 119. It is also "entirely beside the point" that discrimination claims were not before the arbitrator, because "[t]here is no suggestion in Collins that the plaintiff had presented his evidence of discriminatory . . . intent to the arbitrator" either. Gallimore-Wright v. Long Island R. Co., 354 F. Supp. 2d 478, 491-92 (S.D.N.Y. 2005).

Against this backdrop, plaintiff has failed to demonstrate that a reasonable jury could conclude that his termination was the result of discrimination, either by evidence of pretext or by direct evidence of discriminatory animus. See James, 233 F.3d at 156.

First, because most of plaintiff's negative performance reports came from K'Tori, who also made the decision to bring the § 3020-a charges that initiated plaintiff's termination proceeding – and those reports appear to have in large part influenced the arbitrator – I must consider the risk that they could have been part of a "paper trail" to cover up discriminatory motives. See Lawrence v. State Univ. of New York, No. 01-cv-7395, 2002 WL 31812700, at *4 (S.D.N.Y. Dec. 12, 2002). Even taking the evidence in the light most favorable to plaintiff, however, there is no reason to think that they were.

"[W]here a plaintiff can provide no circumstantial evidence . . . that negative evaluations of his job performance were unfair or improperly issued, and all objective indications show fair evaluation procedures, there is no material issue of genuine fact to be tried, and plaintiff's claim cannot survive summary judgment." Id. at *5; see also Ralkin v. New York City Transit Auth., 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding that "many of plaintiff's factual disputes appear to be rationalizations for her allegedly unsatisfactory performance, rather than demonstrations of any material fact to be tried").

Mere "disagreement with [an] employer's evaluation of [an employee's] performance is insufficient to establish discriminatory intent" because "disagreements . . . do not, as a matter of law or logic, mean that present poor performance reviews [are] unfounded." Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 576 (S.D.N.Y. 2010) (quoting Ricks v. Conde Nast Pubs., Inc., 6 F. App'x 74, 78 (2d Cir. 2001)); cf. Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp., No. 10-cv-1894, 2012 WL 3288234, at *8 (E.D.N.Y. Aug. 10, 2012) (lack of clear proof of poor performance and evidence that it was only when the defendants set out to justify their decision to fire the plaintiff that they began documenting performance problems raised questions of fact as to discrimination).

Indeed, there is no requirement that an employer's negative assessments have been objectively correct, only that the assessments have been made in good faith. See Pacenza v. IBM Corp., 2009 WL 890060, at *14 (S.D.N.Y. Apr. 2, 2009), aff'd, 363 F. App'x 128 (2d Cir. 2010); see also Kaur v. New York City Health & Hospitals Corp., 688 F. Supp. 2d 317 (S.D.N.Y. 2010) (holding that in an employment discrimination action, performance reviews and complaints submitted by employer on motion for summary judgment showed employer's state of mind in making employment decisions regarding the employee).

In addition, at least three other individuals – Principal Newman, Assistant Principal Earl Braithwaite, and Suzanne Rockman – gave plaintiff unsatisfactory ratings. When the negative evaluation comes from someone other than the decision-maker, we are "decidedly not interested" in the truth of the allegations against a plaintiff; rather, what matters is what "motivated the employer; the factual validity of the underlying imputation against the employee is not at issue." McPherson, 457 F.3d at 216 (quoting U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)) (internal quotation marks omitted); Alvarez v. Norden Sys., Inc., No. 88-cv-

879, 1989 WL 99837, at *3 (S.D.N.Y. Aug. 24, 1989), aff'd, 930 F.2d 911 (2d Cir. 1991)

(denying plaintiff's motion to strike statements in affidavits related to allegations that he had

engaged in misconduct, explaining that the purposes for which the statements were offered were

"to demonstrate what information [the employer] had available . . . when making [his] decision

to terminate [the plaintiff] and the motivation behind that decision").

 Finally, plaintiff's co-worker affidavits attesting to his skill as a teacher are not

appropriately considered on summary judgment, because "a coworker's positive opinion of a

plaintiff's work is inadequate to create an issue of fact where the employer was dissatisfied with

plaintiff's performance." Josma v. New York City Health & Hosps. Corp., No. 10-cv-3610, 2012

WL 3861171 (E.D.N.Y. Sept. 5, 2012) (citing Anderson v. Baxter Healthcare Corp., 13 F.3d

1120 (7th Cir. 1994)). Similarly, the vast majority of plaintiff's purported evidence that he was

"spy[ed] on" and set up to fail amounts to nothing more than conclusions, which also are

inappropriate to consider on summary judgment. See ITC Ltd., 482 F.3d at 151. The few factual

contentions that *are* properly considered, such as the fact that plaintiff was required to teach

certain grade levels for the first time on K'Tori's watch (when he does not contend that he was

unqualified to do so), even viewed in a light most favorable to plaintiff, are simply insufficient to

support an inference that K'Tori's performance reviews were "unfair or improperly issued" or

the product of "bizarre or duplicitous processes." McPherson v. New York City Dep't of Educ.,

457 F.3d 211, 216 n.7 (2d Cir. 2006).

 Plaintiff's additional evidence of discriminatory animus with respect to his ADEA claim

boils down to one purportedly "ageist" comment and a handful ways in which plaintiff contends

that K'Tori treated younger teachers preferentially.  This evidence is insufficient to show "but-for" causality.[2]

Circumstances contributing to an inference of age-based discrimination may include: Invidious comments about people in the protected age class; more favorable treatment of younger employees; criticism of an employee's work performance in age-related degrading terms; a sequence of events leading to an employee's termination; or the timing of the termination.  See Chambers, 43 F.3d at 37.

Purportedly invidious remarks are central to plaintiff's evidence of discrimination in this case.  Such remarks about a protected class do not themselves give rise to an inference of discrimination under Title VII unless they are accompanied by other evidence of discrimination or a plaintiff demonstrates a "nexus" between the remark and the adverse employment action. See Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 518-19 (S.D.N.Y. 2004).  Relevant considerations include "when the remark was made in relation to the employment decision at issue" and "the context in which the remark was made (i.e., whether it was related to the decision-making process)."  Henry v. Wyeth Pharm., 616 F.3d 134, 149 (2d Cir. 2010).  It is also appropriate to assess whether a reasonable juror would view the remark as discriminatory.  Id. Where a remark is "ambiguous" as to whether it "reflects discriminatory animus" it is not sufficient to support an inference of discrimination.  Mayling Tu v. OppenheimerFunds, Inc., No. 10-cv-4971, 2012 WL 516837, at *7 (S.D.N.Y. Feb. 16, 2012).

---

[2] Plaintiff also contends that K'Tori displayed a "pattern" of eliminating older teachers from the school by giving them "overly harsh observations" in order "to force them out and would consistently replace them with younger, female teachers."  Plaintiff's affidavit lists five former colleagues that he avers were "harassed until they either resigned, transferred, or were brought up on charges to be terminated" and then replaced with younger teachers, but he provides no further detail (and points to no additional evidence) to show the nature of any such harassment.  I must disregard such conclusory assertions.  See ITC Ltd., 482 F.3d at 151.

Plaintiff's opposition to summary judgment relies heavily the contention that he was treated less favorably than younger teachers, such as the fact that when he "was teaching with a small group, K'Tori required him to stand, while younger teachers were allowed to sit in these situations." This purported discrepancy fails to evidence disparate treatment as a matter of common sense, however, because plaintiff conceded at his deposition that he did not observe younger teachers teaching small groups while seated while being observed by K'Tori.

Plaintiff also emphasizes the fact that K'Tori only brought § 3020-a charges against two other teachers (in addition to him) during his time as Principal, and that those teachers are also over 40 (*i.e.*, in plaintiff's protected class). However, the probative value of this fact as evidence of disparate treatment is undermined by plaintiff's admission that K'Tori terminated at least one non-tenured teacher who was not in the protected class. See Cai v. Wyeth Pharm., Inc., No. 09-cv-5333, 2012 WL 933668, at *8 (S.D.N.Y. Mar. 19, 2012) ("Because employees outside the protected class were subject to the same treatment as those in the protected class, there is no indication that [the defendant] treated younger employees more favorably.").

Plaintiff's other purported evidence of disparate treatment of older teachers – that K'Tori took longer to remove a problematic student from his class than from a younger colleague's class, or that he praised a younger colleague for the condition of a library that had not changed – simply are not enough to raise an inference that age was the "but for" cause of plaintiff's termination in light of the significant volume of evidence that plaintiff was terminated because of his performance.

Plaintiff's evidence of religious animus consists almost exclusively of remarks made by K'Tori to him and his co-workers. They are insufficient to raise any inference that plaintiff was fired because he was Jewish. To whatever extent the fact that K'Tori informed one of plaintiff's

co-workers that the school would not pay for the installation of a Menorah suggests a preference for Christianity, *i.e.*, that K'Tori had any personal involvement in the allocation of funds for holiday decorations, this incident still could not lead a reasonable juror to conclude that K'Tori terminated plaintiff because of his religion. See Schoenberg v. Fifth Third Bank, No. 07-cv-276, 2008 WL 4758674, at *9 (S.D. Ohio Oct. 28, 2008) (no inference of discrimination raised when employee asked employer if there was "something that we could put out" like a Star of David or a Menorah, and employer "looked puzzled, and said no").

None of the other comments on which plaintiff relies is sufficiently related to plaintiff's termination to give rise to an inference that it was based on religious animus, see Henry, 616 F.3d at 149. Moreover, none is sufficiently "ethnically degrading" nor "invidious" so as to support an inference of discriminatory intent. Chambers, 43 F.3d at 37.

Plaintiff's opposition to summary judgment on his race claim is premised almost entirely a statement or statements by K'Tori to the effect that plaintiff or other teachers were hurting little black children. Plaintiff testified at his deposition that K'Tori made comments to this effect on "a number of occasions." Unlike K'Tori's comments about religion, these do bear some connection to defendants' proffered reasons for plaintiff's termination – specifically, the impact of his poor performance on his students – but neither the statement captured on the 2009 audio recording nor a similar statement recalled by plaintiff's co-worker Deta Hershkoff makes any mention of the race of the teacher. At least in the case of the statement that was recorded, there can be no serious dispute that what defendant sought to convey was that plaintiff's perceived lack of pedagogy was damaging to the children's futures.

There is one statement in the record that gives me greater pause. Plaintiff's co-worker Debra Wortman avers that K'Tori made a comment, apparently to a group of faculty members,

about "you white teachers" harming black students. It is difficult to say that a reasonable jury could not infer discriminatory animus toward white teachers on the basis of this remark, and it is even more troubling that K'Tori made similar remarks directly to plaintiff, in connection with the very same negative performance that defendants rely on to justify plaintiff's termination.

In Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712 (2d Cir. 2010), the Second affirmed a grant of summary judgment for an employer despite the plaintiff's own testimony that a manager had opined to her that she had been discriminated against. The Court found error in the District Court's decision to disregard the plaintiff's testimony about the manager's statement because it did not seem credible. Nevertheless, the Court affirmed the result because the remark constituted only a "'scintilla of evidence' supporting her claim." Id. at 726-27 (quoting Anderson, 477 U.S. at 252, 106 S. Ct. 2505).

That can be said of the remark at bar as well, but in so holding, the Court in Fincher surmised that "[s]ummary judgment might not have been justified were [the manager]'s alleged remarks themselves imbued with discriminatory animus, rather than a report of purportedly discriminatory action." Id. at 727. That, in turn, might suggest that K'Tori's statement is enough to allow a reasonable jury to infer discrimination, at least on plaintiff's race claim.

However, there is another consideration here that was not before the Court in Fincher. Even when "a reasonable juror could find that the remark itself was discriminatory," one remark is not enough to defeat summary judgment when it is "too remote in time and context to support a reasonable inference that [a plaintiff]'s discharge was a result of race discrimination." Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (citing Dixon v. Int'l Fed'n of Accountants, 416 F. App'x 107 (2d Cir. 2011). In this case, there is no mention in

the record of when K'Tori's remark about white teachers was made, or to whom (other than Ms. Wortman) it was made, or in what context.

Against this single remark, I have to weigh the reasoned conclusion of the arbitrator after conducting more than a week of hearings, and the repeated criticisms of plaintiff's teaching ability from administrators other than K'Tori. In light of the strong presumption of legitimacy created by the arbitrator's decision, see Collins, 305 F.3d at 119, this single remark is simply too attenuated from plaintiff's termination to create an inference that he was fired because he was white, and not because his pedagogical failures were perceived as harmful to his students, who happened to be black. See Henry, 616 F.3d at 149.[3]

### B.    Hostile Work Environment

In order to raise a triable issue of fact as to a hostile work environment claim, a plaintiff must adduce evidence showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted). "It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). In addition, "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004). Anti-discrimination laws "are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every

---

[3] Plaintiff also makes the conclusory assertion that there are questions of fact as to his race and religion claims because in addition to making comments about black children and Jewish teachers, K'Tori "more generally subjected [plaintiff] to disparate treatment in comparison to his coworkers that were outside of his protected class(es)," but offers no specifics. Just as with his contentions about harassment of older teachers, I disregard these conclusory assertions. See ITC Ltd., 482 F.3d at 151.

desire will be fulfilled." Ruggieri v. Harrington, 146 F. Supp. 2d 202, 218 (E.D.N.Y. 2001). In assessing a hostile work environment claim, "courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Rivera, 743 F.3d at 20.

I therefore limit my assessment of plaintiff's work environment to those incidents of mistreatment that are connected to a protected characteristic, and then I must determine whether such incidents, individually or in the aggregate, are sufficiently severe and pervasive to support this claim. See Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002); Robinson v. Zurich N. Am. Ins. Co., 892 F. Supp. 2d 409 (E.D.N.Y. 2012) (employer's facially-neutral actions in assigning the employee tasks without training, subjecting the employee to high scrutiny, and denying the employee vacation time, were insufficient to establish a hostile work environment claim because there was no evidence that the employer's actions were based on the employee's race or age); Mayling Tu, 2012 WL 516837, at *17 (no actionable hostile work environment where constant put downs and interruptions "reflect[ed] no hint as to any racial reason" (internal quotation omitted)).

Plaintiff's evidence in support of a hostile work environment for the most part overlaps with the evidence that he argues shows discriminatory animus or that K'Tori was setting him up to fail. In addition, plaintiff argues that his assignment to a "closet" was evidence of discriminatory harassment. He therefore relies in large part on facially neutral incidents: being closely scrutinized, denied a request to transfer a student out of his classroom, and disadvantaged because he was assigned multiple co-teachers, and so on. Almost none of this evidence, apart from one comment that was directed at him concerning "little black kids," can be said to have

any connection to plaintiff's age, religion, or race. The facts of this case are a far cry from a situation in which plaintiff was subjected to discriminatory harassment because he was "singled out . . . on an almost daily basis on account of" a protected characteristic. <u>Feingold v. New York</u>, 366 F.3d 138, 150 (2d Cir. 2004)

Courts have routinely held that actual or perceived mistreatment similar to that relied on by plaintiff in this case fall significantly short of what is considered severe or pervasive hostility. See <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 150 (2d Cir. 2006) ("close monitoring of [the plaintiff's] work" and fact that the employer "review[ed] her budget with a fine-toothed comb" not actionable); <u>Francis v. Elmsford Sch. Dist.</u>, 263 F. App'x 175 (2d Cir. 2008) (relocating teacher to a hallway did not constitute an alteration of the conditions of her employment).

Even taken in the aggregate, plaintiff's purported evidence of a hostile work environment does not rise to the level of "genuine" workplace harassment. <u>Ruggieri</u>, 146 F. Supp. 2d at 217-18 ("This collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment.").

## CONCLUSION

Defendants' [24] motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**


_____
                              U.S.D.J.


Dated: Brooklyn, New York
          September 16, 2015